# 13 CV 6567

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| D-TEK MANUFACTURING, on behalf of itself and all others similarly situated,<br><br>*Plaintiff*<br><br>vs.<br><br>THE GOLDMAN SACHS GROUP, INC., GS POWER HOLDINGS LLC, METRO INTERNATIONAL TRADE SERVICES LLC, GLENCORE XSTRATA PLC, PACORINI METALS USA, LLC, JPMORGAN CHASE & CO., HENRY BATH LLC, HENRY BATH & SON LIMITED, LONDON METAL EXCHANGE LIMITED, and LME HOLDINGS LIMITED,<br><br>*Defendants.* | Civil Action No.<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |



RECEIVED
SEP 17 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff D-Tek Manufacturing, individually and on behalf of all other similarly situated purchasers of aluminum, brings this class action against defendants The Goldman Sachs Group, Inc., GS Power Holdings LLC, Metro International Trade Services LLC, Glencore Xstrata PLC, Pacorini Metals USA, LLC, JPMorgan Chase & Co., Henry Bath LLC, Henry Bath & Son Limited, the London Metal Exchange Limited, and LME Holdings Limited to obtain injunctive and equitable relief and compensation for damages they suffered in purchasing aluminum at inflated prices as a result of the defendants' anticompetitive conduct.

## I.    Nature of the Case

1.    Plaintiff alleges that the defendants engaged in anticompetitive conduct that inflated the price of aluminum.  In 2010, Goldman Sachs, JPMorgan and Glencore acquired large metals warehousing businesses.  Together with the London Metal Exchange (the LME), they conspired to monopolize the United States market for LME-certified warehousing of aluminum, amass vast amounts of aluminum in their warehouses, create a bottleneck in aluminum supply, and inflate the price of aluminum.

2.    The LME is a metals trading exchange that also controls a large network of certified metal storage warehouses around the country.  Goldman Sachs, JPMorgan and Glencore entered into an agreement with the LME to stockpile aluminum by offering aluminum producers incentives to use their LME-certified warehouses and by transporting aluminum from warehouse to warehouse instead of delivering it to purchasers.  In Detroit alone, the amount of aluminum stored in LME-certified warehouses increased from 900,000 tons to 1.49 million tons between 2010 and 2012.  This increase in aluminum stored in LME-certified warehouses is not attributable to any independent economic or business considerations.  Aluminum purchasers who had waited only six weeks for delivery before the defendants' agreement were subject to sixteen-month delays

2

by July 2013.

      3.     The defendants' conduct increased prices for all aluminum purchasers, not just those who purchased aluminum stored in an LME warehouse. Aluminum prices have multiple components, one of which is a premium known as the Midwest Premium that fluctuates based on several factors, including freight and storage costs, available supply, and consumer demand. By bottlenecking supply and driving up storage costs, the defendants caused the Midwest Premium to rise dramatically. The Midwest Premium increased nearly 50% between January 2010 and May 2011. Despite the enormous surplus of aluminum in the market due to the defendants' stockpiling, aluminum prices hit a record high the week of January 7, 2013, having increased by 48% over the prior 12 months.

      4.     The defendants have collected hundreds of millions of dollars in storage fees for the many months they store purchasers' aluminum. The LME receives 1% of all storage fees paid to its certified warehouses. Until recently, Goldman Sachs and JPMorgan were two of the LME's largest shareholders with a combined 20.5% of its shares. In that capacity, they benefitted not only from the storage fees the LME received from its network of warehouses but also from Hong Kong Exchanges & Clearing Limited's purchase of the LME in December 2012 for $2.15 billion—a transaction made possible by the financial projections the LME was able to present due to the defendants' conduct. Goldman's stake was valued at $208 million, and JPMorgan's at $230 million. And as two of the largest derivative traders in the metals market, Goldman Sachs and JPMorgan have the capacity to capitalize on their control over a substantial portion of the country's aluminum supply by manipulating the supply and price of aluminum to benefit their derivative positions.

      5.     Plaintiff D-Tek Manufacturing brings this lawsuit on its own behalf and on behalf

of a class of others who are similarly situated to recover damages for the inflated prices plaintiff and class members paid as a result of the defendants' unlawful and anticompetitive conduct.

## II.    Parties

### A.    Plaintiff

6.    D-Tek Manufacturing is a California corporation that specializes in the production, import and installation of machinery.  D-Tek's principal place of business is in Santa Clara, California.  Between February 1, 2010 and the present, D-Tek purchased aluminum from distributors on many occasions and suffered antitrust injury in the form of higher prices for aluminum as a result of the defendants' unlawful conduct.

### B.    Defendants

7.    The Goldman Sachs Group, Inc. is a global investment banking, securities and investment management firm incorporated in Delaware with a principal place of business at 200 West Street, New York, New York 10282.

8.    GS Power Holdings LLC is a subsidiary of Goldman Sachs that operates primarily as an electricity distributor.  It acquired Metro International Trade Services LLC in February 2010. GS Power is organized under the laws of Delaware and maintains its principal place of business at 85 Broad Street, New York, New York 10004.

9.    Metro International Trade Services LLC is a global warehouse operator that specializes in the storage of non-ferrous metals, including aluminum, for the London Metal Exchange.  It has operated as a subsidiary of GS Power since it was acquired by Goldman Sachs in February 2010. Metro is a limited liability company organized under the laws of Delaware and has its principal place of business in Romulus, Michigan.

10.    Together, Goldman Sachs, GS Power and Metro are referred to as Goldman.

11.     Glencore Xstrata PLC is a multinational commodity trading and mining company organized under the laws of the United Kingdom and headquartered in Baar, Switzerland with its registered office in Saint Helier, Jersey.

12.     Pacorini Metals USA, LLC, a provider of LME warehousing and logistics services, was acquired by Glencore in September 2010. Pacorini is incorporated in Louisiana and has its principal place of business at 5736 Citrus Blvd., Suite 104, New Orleans, LA 70123.

13.     Together, Glencore Xstrata and Pacorini Metals are referred to as Glencore.

14.     Henry Bath LLC is an international logistics provider specializing in the storage and shipping of exchange traded metals and soft commodities around the globe. Henry Bath is organized under the laws of Delaware and has its principal place of business at 2500-A Broening Highway, Baltimore, Maryland.

15.     Henry Bath & Son, Ltd. is a London based company that stores and ships exchange-traded metal, including aluminum, around the world. It is the corporate parent of defendant Henry Bath LLC, and is headquartered at 12 Princes Parade, St. Nicholas Place, Liverpool L3 1 BG, United Kingdom. A registered agent for service of process is located in Baltimore, Maryland.

16.     JPMorgan Chase & Co. is an investment bank and financial services firm incorporated in Delaware with its principal place of business at 270 Park Avenue, New York, New York. JPMorgan acquired the Henry Bath Group in February 2010.

17.     Together, JPMorgan, Henry Bath and Henry Bath & Son are referred to as JPMorgan.

18.     The London Metal Exchange Limited, or LME is a private company incorporated under the laws of the United Kingdom and headquartered at 56 Leadenhall Street, London,

England.  The LME does business in the United States.  Among other things, it holds meetings in the United States to encourage warehouses to use LME contracts and conducts storage operations through its certified warehouses, which hold most of the aluminum in the United States.  The LME's electronic and telephonic trading forums involve transactions with individuals and businesses in the U.S.

19.     LME Holdings Limited is a U.K. corporation that owns the LME.  Defendants Goldman Sachs and JPMorgan were two of its largest shareholders until it was acquired by Hong Kong Exchanges & Clearing Limited on December 6, 2012.  Its principal place of business is in the United Kingdom and it has a registered agent in Delaware.

## III.   Jurisdiction and Venue

20.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the proposed class, and at least one member of the proposed class is a citizen of a state different from that of one of the defendants.

21.     This Court also has jurisdiction over this matter under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 because plaintiff brings claims under section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy the defendants' violations of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court has jurisdiction over the defendants because they are present in the United States, do business in the United States, have registered agents in the United States, may be found in the United States, and are otherwise subject to the service of process provisions of 15

U.S.C. § 22.

23.     Venue is appropriate within this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c), because the defendants do business in this district, several of the defendants have offices in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## IV.     Factual Allegations

### A.     The Regulatory Background

24.     The separation of banking and commerce is one of the fundamental principles underlying the United States system of bank regulation.  Historically, banks were not permitted to conduct any activities falling outside the business of banking.

25.     In 1933, Congress enacted the Glass-Steagall Act to sever investment from commercial banking by prohibiting banks from participating in the securities dealing and underwriting business or from affiliating with securities firms.  The Act effectively created a wall of separation between depositors' funds and risky investments like the stock market.

26.     In 1956, Congress passed the Bank Holding Company Act, which allowed bank holding companies, or BHCs, to conduct a wider range of activities through subsidiaries that do not take deposits, although the activities still had to be closely related to banking.  The Act was designed as an antitrust, anti-monopoly statute.  It was intended to keep institutions that are engaged in deposit-taking and commercial lending from doing business in non-financial markets.  Congress also sought to prevent the concentration of economic power in the hands of financial-industrial megafirms.

27.     In 1996, the Board of Governors of the Federal Reserve System voted to increase the revenue ceiling and permit BHCs (through subsidiaries) to underwrite securities as long as the

securities did not constitute more than 25% of the BHC's revenues. In 1999, however, Congress passed the Gramm-Leach-Bliley Act, which partially repealed the Glass-Steagall Act and amended the Bank Holding Company Act by allowing commercial banks and investment banks to consolidate into "financial holding companies," or FHCs. The Gramm Leach Act permits FHCs to, among other things, passively invest in a commercial entity and elect any or all of the entity's directors. An FHC may thus own and control a commercial company so long as doing so is "complementary" to a financial activity.

28.     The definition of "complementary" has been significantly expanded since the Act was passed in 1999, when a JPMorgan executive characterized it as referring to activities like owning a magazine to facilitate the advertisement of financial products. Over the last ten years, FHCs like Goldman Sachs and JPMorgan have become major merchants of physical commodities like aluminum and oil.

**B.     The Aluminum Market**

29.     Aluminum originates as an oxide called alumina. Aluminum manufacturers known as smelters mine deposits of bauxite ore, extract alumina, and refine the alumina into aluminum through an electrolytic reduction process. The manufacturers then shape the aluminum into ingots, billets and other similar forms.

30.     Mills buy the ingots and billets from smelters through the LME or long term contracts. The mills process the ingots and billets into sheet, plate, coil and other semi-fabricated forms.

31.     Integrated producers perform the functions of both manufacturers and mills, and sell aluminum in both its initially-manufactured forms and semi-fabricated forms.

32.     Traders and distributors buy semi-fabricated aluminum from smelters, integrated

8

producers and mills to sell to purchasers like plaintiff D-Tek.

### C.     The London Metal Exchange

33.     The London Metal Exchange, or LME, brings together participants from the physical industry and the financial community to create a market for buyers and sellers, and provides producers and consumers of metal with a physical market and the ability to hedge against the risk of rising and falling world metals prices.  The LME says that it protects the integrity of the market by monitoring the fairness and ensuring the transparency of trading.

34.     Historically, aluminum mills, aluminum extrusion companies, and other consumers with large aluminum needs purchased aluminum directly from producers and the LME was a market of last resort, where producers would go to sell their stock in times of oversupply and where purchasers would go to buy metal in times of extreme shortage.  Today, the LME advertises itself as the "world centre for industrial metals trading" and boasts that "[m]ore than 80% of global non-ferrous business is conducted here and the prices discovered on our three trading platforms are used as the global benchmark."

35.     Until July 2012, JPMorgan was the largest shareholder of LME Holdings Limited, the company that owns the LME, with approximately 11% of its ordinary shares, and Goldman was its second largest shareholder with approximately 9.5% of its shares.

36.     The LME allows purchasers to buy aluminum from aluminum producers on the spot market or the futures market.  In the spot market the agreement is made and payment and delivery of the aluminum (or "settlement") occurs immediately or soon after.  Parties entering into a futures contract agree to the price, terms and delivery date, but the settlement occurs on a later date.  Because prices in the futures market are ordinarily governed by supply and demand, buyers and sellers of futures contracts who have knowledge of the product's supply and demand (and the

accompanying impact on price trends) have a valuable advantage.

37.     The LME has three trading venues: (1) the electronic trading system (known as

LMEselect); (2) the physical "Ring trading" market, the LME's open-outcry trading floor named

for the shape of the floor in London; and (3) telephonic interoffice trading.  LME members fall

into different categories depending on their trading rights.  JPMorgan is a category 1 "Ring-

dealing" member and has the right to trade in all three of the LME's venues.  Goldman Sachs is a

category 2 member and can trade on LMEselect and the interoffice market but not the Ring.  One

of Glencore's subsidiaries is a category 5 "associate trade" member, which means that it has the

ability to trade with a more limited group of entities.

38.     Since February 2010, the LME has captured 97 to 99% of the volume of aluminum

futures contract trading on organized exchanges in the United States.  As a result, the LME plays a

significant role in setting the market price of aluminum regardless of where the aluminum is

purchased.

**D.      Aluminum Pricing**

39.     The price a purchaser pays for aluminum has multiple components: (1) the base

price, which is the "LME Official Price";[1] (2) the Midwest Premium, which is an industry value

calculated on a weekly basis by factoring in the cost of freight, market supply and consumer

demand; and (3) additional fees and premiums for shaping the aluminum into a particular form or

delivering it over longer distances.

40.     The Midwest Premium is the benchmark used for physical trading of aluminum in

North America.  It originally reflected the cost of delivering aluminum to the Midwest from sellers

_____

[1] The LME Official Price is the last bid and offer price quoted during the second "Ring session"
on LME aluminum trading days.  Each LME metal is traded in five-minute Ring sessions that are
representative of global supply and demand.

on the east coast, but it now fluctuates in response to the supply and demand of physical aluminum in addition to transport and holding costs. The Midwest Premium is published by the publishing company Platts from commercial data collected from industry buyers and sellers by Platts reporters.

### E.     The LME's Network of Certified Warehouses

41.     In addition to providing a forum to trade futures and spot contracts, the LME also certifies warehouses that manage the housing and shipment of aluminum to purchasers. The LME has a network of more than 700 certified warehouses that extends across 36 locations in 14 countries. The warehouses are located in areas of high consumption and in transportation hubs. Because of their prime locations, the LME warehouses store much of the producers' supply of aluminum.

42.     Aluminum producers store primary and semi-fabricated aluminum in warehouses. Purchasers (mills, extruders and large companies) pay for storage and the warehouses deliver the aluminum to the purchasers.

43.     The LME receives 1% of all storage fees paid to its certified warehouses.

44.     LME warehouses are a critical part of the supply chain for aluminum because LME delivery warrants can only be issued and canceled in LME-certified warehouses. An LME warrant is a standardized document issued by a warehouse that identifies who has the right of possession of a lot of aluminum. The warrant is canceled when the aluminum has been earmarked for delivery from the warehouse. LME warrants are the only standardized instruments of title for aluminum, and they entitle the bearer to a specific brand of aluminum in a specific location in a particular warehouse. LME warrants are freely tradable and are the instruments that underpin LME paper futures transactions. For LME futures contracts, delivery of a warrant represents

delivery of the corresponding physical aluminum.

45.     In February 2010, Goldman Sachs subsidiary GS Power acquired Metro, a metals warehousing company that owns and operates twenty-nine warehouses in the Detroit metropolitan area in addition to warehouses in other parts of the United States, Europe and Asia.  Metro is one of the largest LME-certified metals warehouse networks in the world.  Through Metro, Goldman Sachs controls 73 of the 157 U.S.-based LME-certified warehouses.  Metro also has a seat on the LME's Warehousing Committee, which makes recommendations on warehousing-related policy issues, plays a role in developing the rules and regulations governing the warehouses, and advises the executive committee about "relevant issues including industry views, changes to industry structures and other appropriate matters," among other things.

46.     Also in February 2010, JPMorgan announced that it was acquiring metals warehousing company Henry Bath.  Through Henry Bath, JPMorgan controls at least 79 LME-certified warehouses around the world, with multiple facilities in Baltimore, New Orleans and Chicago.  Henry Bath has a seat on the LME's Warehousing Committee.  The head of JPMorgan's global commodities group remarked that "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture. … We need to be active in the underlying physical commodity markets in order to understand and make prices."

47.     A short time later, in August 2010, Glencore announced its acquisition of the metals warehousing business of Italy's Pacorini Group.  Glencore now owns numerous LME-certified warehouses around the world, including warehouses in Detroit, Los Angeles, New Orleans, Mobile, Chicago, Baltimore and Louisville.  In May 2013, Glencore became the largest owner of LME-certified warehouses when it acquired Xstrata PLC.  Pacorini also holds a seat on

the LME's Warehousing Committee.

48.     The defendants' ownership of 131 or nearly 84% of LME-certified warehouses in the United States establishes their control over the country's supply of aluminum.  This chart shows the location of LME-certified warehouses and aluminum in the United States, and the percentage of those warehouses that were owned by the defendants as of August 13, 2013:

| City | Number of LME-certified warehouses | LME-certified warehouses controlled by the defendants | | Percentage of LME-certified primary aluminum |
|---|---|---|---|---|
| New Orleans | 54 | 52 | 96.2% | .03% |
| Detroit | 37 | 31 | 83.7% | 80.88% |
| Chicago | 18 | 16 | 88.8% | .78% |
| Mobile | 17 | 17 | 100% | 3.89% |
| Baltimore | 16 | 6 | 37.5% | 13.52% |
| Toledo | 7 | 5 | 71% | .55% |
| St. Louis | 3 | 1 | 33% | 0% |
| Los Angeles | 2 | 2 | 100% | .35% |
| Owensboro | 2 | 0 | 0% | 0% |
| Long Beach | 1 | 1 | 100% | 0% |
| **Total** | **157** | **131** | **83.4%** | 100% |

**F.     The Defendants Agree to Stockpile Aluminum**

49.     Before February 2010, when Goldman, JPMorgan and Glencore started buying up metals warehouses, aluminum purchased on the LME was delivered to consumers in approximately 6 weeks.

50.     At the time, the LME required its certified warehouses to release a minimum of 1,500 tons of aluminum each day.  This daily minimum, referred to by the LME as the "load out rate," applied to all of a company's warehouses in a particular city, not to each warehouse

individually. Metro, for example, was required to release a total of 1,500 tons of aluminum from its 27 Detroit warehouses each day. Because the minimum was not tied to the amount of aluminum brought into a warehouse on any given day, the warehouses could take in aluminum as rapidly as it was produced but only had to send out 1,500 tons per day.

51.     Once the defendants acquired control over the majority of LME-certified warehouses, they treated the 1,500 ton per day load out rate as a *maximum* instead of a minimum requirement.

52.     The warehouses charge daily storage fees for the metal in their warehouses, so the more aluminum they stored, the more fees they—and the LME—collected.

53.     To increase the amount of aluminum in their warehouses, the defendants offered incentives to smelters and mills to store aluminum in their warehouses and to aluminum speculators to renew leases for storage of their aluminum. The amount of the incentives was tied to the Midwest Premiums, because to encourage aluminum producers to use their warehouses, the defendants had to pay incentives that matched or exceeded the premium the producers would receive from purchasers if the producers shipped the aluminum directly.

54.     Metro, for example, dramatically increased its incentive payments to aluminum traders after it was acquired by Goldman Sachs. In early 2010, Metro paid incentives of $60 per ton, but increased them to $120 per ton by the end of the year. In 2011, Metro offered incentives of approximately $150 per ton, and up to $180 per ton in 2012. By January 2013, Metro was paying incentives of $210 to $215 per ton.

55.     The incentives worked. In Detroit alone, the amount of aluminum stored in LME-certified warehouses rose from 900,000 tons to 1.49 million tons between 2010 and 2012.

56.     Another way the defendants increased the amount of aluminum in their warehouses

was to transport the daily minimum of released aluminum from warehouse to warehouse instead of delivering it to the market. One Metro employee described this practice as a "merry go round of metal."

57.     By June 2011, the average delivery time for aluminum from LME warehouses had increased from six weeks to six months.

### G.     Public Complaints About the Delays and the Defendants' Anemic Response

58.     The delivery delays were not due to a lack of supply. The LME warehouses were full of aluminum that could have been delivered to purchasers within several weeks. For example, Metro took in approximately 360,000 tons of aluminum in the first half of 2011. It delivered only 171,350.

59.     The chief procurement officer for Novelis, the world's largest producer of semi-fabricated aluminum, commented in July 2011, "I don't know the specific details of every warehouse but our view is that they seem to be able to absorb metal coming in at almost an infinite rate and so we feel there's a lot more they can do on the output side to push up the (load out) rates." He added, "It's driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market. It's because of an issue of accessing metal … in Detroit warehouses." He estimated that the Midwest Premium had increased by $20 to $40 per ton because of the backlogs at the Detroit LME-certified warehouses, forcing U.S. businesses to pay millions of dollars extra for the 6 million tons of aluminum they use each year.

60.     In June 2011, Robin Bhar, a veteran metals analyst at Credit Agricole in London said, "I think it makes a mockery of the market. It's a shame." He described the defendants' conduct as "an anti-competitive situation. It puts (some) companies at an advantage, and clearly the rest of the market at a disadvantage. It's a real, genuine concern."

61.     Jorge Vazquez, a senior vice president at aluminum industry analyst Harbor Intelligence, observed in June 2011 that the defendants' practice of delaying shipments was "one of the factors that, without a doubt, is behind record high Midwest Premiums."

62.     In June 2011, Coca-Cola lodged a complaint with the LME about Goldman's creation of supply bottlenecks to artificially raise the price of aluminum in the open market. "This situation has been organized artificially to drive premiums up," said Dave Smith, Coca-Cola's procurement manager. "It takes two weeks to put aluminum in, and six months to get it out."

63.     On April 1, 2012, the defendants responded to aluminum consumers' outrage over the delivery delays by agreeing to increase the daily minimum output requirement for LME-certified warehouses from 1,500 to 3,000 tons per company per city. But at the same time, they increased daily storage fees. The LME-certified warehouses in Detroit increased their daily storage fee from 40 cents in 2010 to 41 cents in 2011, and 45 cents in 2012.

64.     The negligible increase in the daily minimum did little to alleviate the delays because the defendants continued to treat it as a maximum rather than a minimum. In Detroit, for example, Metro had to release a mere 111 tons per day from each of its 27 warehouses.

65.     As the delays and complaints continued, the defendants agreed to increase the daily minimum output for LME-certified warehouses again on April 1, 2013, raising it from 3,000 to 3,500 tons per company per city. But they also increased storage fees at the LME-certified warehouses once again. The Detroit warehouses raised their storage fees from 45 cents to 48 cents, a 6.6% increase since 2012 and a 20% increase since 2010.

66.     By July 2013, it took an average of sixteen months for purchasers to receive their aluminum from LME-certified warehouses.

16

**H.     The Defendants' Agreement to Stockpile and Delay Inflated the Price of Aluminum**

67.     Under normal economic conditions, the glut of aluminum would have driven the premium down because when supply increases, the price normally drops. But the defendants created a false scarcity by stockpiling aluminum and then circulating it among their warehouses instead of delivering it to purchasers on a timely basis. The artificially reduced supply of aluminum caused the Midwest Premium portion of aluminum prices to increase.

68.     In addition, because storage fees and delivery delays are part of the calculation of the premium added to the price of aluminum, the defendants' delays result in higher prices for nearly everyone who purchases aluminum, not just those who purchase from LME-certified warehouses.

69.     Consumers with large aluminum needs like extruders or large companies can buy aluminum directly from the smelters or mills to avoid the warehouses, but they will still have to pay inflated prices because of the defendants' conduct, since the Midwest Premium is added to the price of all aluminum sold on the open market.

70.     By May 2011, the Midwest Premium had increased nearly 50% since January 2010 to $210 per ton. Industry analysts have reported that the increase in the Midwest Premium is directly related to the lengthy delivery delays at Metro's warehouses since Goldman Sachs took over.

71.     From 2001 to early 2010, the Midwest Premium averaged 4.76 cents a pound, or $95.20 per ton. Starting in February 2010, when the defendants began acquiring most of the LME-certified warehouses in the United States and agreed to stockpile aluminum and delay deliveries, the Midwest Premium shot up from 5.5 cents per pound or $110 per ton to a 2011 high of 9 cents per pound or $180 per ton. In 2012, the Midwest Premium continued to rise to an

average of 11 cents per pound or $220 per ton.  As of January 2013, the Midwest Premium averaged 11.5 cents per pound or $230 per ton.  In other words, as a result of the defendants' conduct, the Midwest Premium has more than doubled in just three years.

72.    The defendants' scheme also boosted the LME's revenues, allowing it to present future projections that made it an attractive acquisition.  In July 2012, Hong Kong Exchanges & Clearing Ltd. bought the LME for $2.15 billion.  Goldman's stake was valued at $208 million, and JPMorgan's at $230 million.

### I.    Government Investigations of the Defendants' Conduct

73.    In November 2012, the European Union's Enterprise and Industry Directorate General opened an investigation into the LME's warehousing arrangements with another EU body, the Internal Market and Services Directorate General, in response to complaints from the aluminum industry that deliveries from LME-certified warehouses were delayed due to a bottlenecked supply.

74.    In the summer of 2013, the Department of Justice opened an investigation into the metals warehousing industry in response to complaints the defendants were using their ownership of metals warehouses to inflate commodities prices.

75.    The Senate Banking Subcommittee on Financial Institutions and Consumer Protection convened a hearing on July 23, 2013 to address whether banks should be allowed to control warehouses, pipelines, and other infrastructure used to store and transport essential goods. Tim Weiner, a global risk manager for MillerCoors described the impact of the aluminum supply bottleneck:

> Just imagine a warehouse with a big garage door marked "in" and the small front door of your house marked "out."  A lot more metal goes into the warehouse than comes out.  U.S. Manufacturers want to take possession of their metal, but cannot ….  The current system … has cost MillerCoors tens of

millions of dollars in excess premiums over the last several years with no end
in sight. My company and others estimate that last year alone, the LME
warehouse rules have imposed an additional $3 billion expense on companies
that purchase aluminum.

76.    Joshua Rosner, the managing director of market research firm Graham Fisher &

Co., testified about the risks to competition that financial megafirm involvement in non-financial

industries can create:

> The growth of big banks is a case of too much of a good thing metastasizing
> into a bad thing. What started out with a limited safety net designed to
> protect the payments system and to provide a safe place for small,
> unsophisticated depositors to place their savings has morphed into an
> anticompetitive system where government subsidized banks can use unfair
> advantage to enter and dominate any market or business, financial or
> nonfinancial, that they choose. This is inconsistent with those concepts of
> competition and creative destruction that have done so well for our country.

77.    On July 30, 2013 Senator Debbie Stabenow expressed significant concerns about

the defendants' conduct to Senator Gary Gensler, Chairman of the U.S. Commodity Futures

Trading Commission:

> In Congressional testimony, buyers of aluminum allege that the current
> market price of aluminum is being skewed by those who own and profit from
> the storage of metal at warehouses. They allege that warehouse rules dictated
> by the London Metal Exchange's Warehouse Rules and Regulations
> committee have been set by and for the benefit of those who stand to profit
> from the rules, even if it works against consumers and a fair market price.
> They noted that the LME itself gets a portion of the rent charged for storing
> metal at warehouses it oversees. Additionally, they raised questions about
> companies that both help set the rules dictating the flow of aluminum in and
> out of warehouses and also engage in the futures and swaps markets –
> implying a potential for price manipulation. These are serious allegations. I
> am writing to encourage you to further review this issue and clarify the role
> and responsibility of the [CFTC] to address the situation.

78.    The CFTC has directed Goldman Sachs and JPMorgan to preserve their emails,

documents and instant messages from the last three years. CFTC commissioner Bart Chilton said

that "the warehouses charge storage fees and the bottlenecks can impact prices and potentially

move markets. That's not right." The CFTC has since subpoenaed records from a number of

major metals warehousing firms, including defendants Goldman Sachs, JPMorgan and Glencore.

**J.      Reacting to Government and Press Scrutiny, the Defendants Claim to Be Making Some Changes**

79.      In a July 31, 2013 statement, Goldman Sachs acknowledged that "[i]n recent weeks, there has been additional focus on metals warehouses as certain end users have complained about the long wait times to get aluminum out of LME storage." Admitting that "consumers should not have to wait unusually long times to get the metal they store in warehouses," Goldman Sachs said it would be "contacting end users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products."

80.      Also in July, Goldman Sachs suspended the incentives it paid to encourage aluminum producers to use their warehouses, and announced that to "address any concerns that the warehouses are limiting the supply of aluminum" it will:

- "support the intent of the recently proposed rule change by the LME that will cut existing queues and prevent new queues from forming by increasing substantially the amount of daily net outflows of metal at large LME locations";

- "suggest that the LME establish a system to prioritize consumers so that they always have access to a minimum load out rate for end users"; and

- "support enhanced disclosure at the LME, including with respect to who owns the warrants for metals and to designate by broad market participant category who is in the queue."

81.      JPMorgan has defended its conduct by pointing out that aluminum prices have decreased by 40% percent since their peak in 2006, but in referring to the cost of the aluminum alone JPMorgan failed to address the skyrocketing premiums. On July 27, 2013, JPMorgan

subsidiary Henry Bath reportedly asked the LME to delist 21 of its LME-certified warehouses—about a fifth of its warehouses worldwide.

82.    In June 2013, LME CEO Martin Abbott resigned.  And on July 1, 2013, the LME proposed changes in load-out rules that would require warehouses with queues of at least 100 days to deliver aluminum at a rate of at least 1,500 tons more each day than the warehouse brings in.

83.    In the beginning of August, average daily aluminum shipments to LME-certified warehouses dropped 79% from two months earlier, as the defendants reduced their cash incentives from $200 per ton to $50 per ton.  Premiums charged for immediate delivery of aluminum have fallen 7.2% since July.

84.    Amidst the public scrutiny and government investigations, both Goldman Sachs and JPMorgan have announced that they are considering selling their metal warehousing units.

**K.      Goldman Sachs and JPMorgan May Also Profit From the Manipulated Aluminum Prices Through Their Commodity Derivative Trading**

85.    Commodities are a substantial part of both Goldman Sachs's and JPMorgan's trading portfolio.  They enter into various types of commodities derivatives, including futures contracts, swaps (contracts requiring counterparties to exchange liquidity), and options (contracts where the buyer has the right but not the obligation to purchase from or sell to the option writer commodities, currencies or financial instruments).  JPMorgan has been the world commodities leader, increasing the value of its commodities earnings from $514 million in 2010 to over $2 billion in 2011 and 2012.  Goldman Sachs has also realized large profits from its commodities business, with reports of 2012 revenue up to $1.25 billion.

86.    Having access to and being involved in the physical markets provides a perspective and certain advantages that are unavailable to non-warehouse owners.  By both trading on the derivatives market and participating in the physical market, Goldman Sachs and JPMorgan are

able to manipulate the inventory and prices of aluminum and profit through their derivative positions. At the July 2013 Senate hearing, Joshua Rosner recounted testimony offered to the United Kingdom's House of Commons about these advantages:

> [O]n the London Metal Exchange there are four very large companies that own the very warehouses that people deliver metal into. J.P. Morgan is one of them. They own a company called Henry Bath. They are, therefore, a ring-dealing member of the exchange and they also own the warehouse. That is restrictive. They were also reported, at one point, to have had 50% of the stock of the metal on the London Metal Exchange. That is manipulative.

## V.    The Anticompetitive Effects of the Defendants' Scheme

87.    The defendants' anticompetitive scheme included their agreement to (1) acquire companies that own numerous LME-certified warehouses; (2) induce aluminum producers to store their aluminum in the defendants' LME-certified warehouses by, among other things, paying incentives; (3) stockpile aluminum by treating the LME load-out rules as maximums rather than minimums and by shuffling aluminum among warehouses instead of delivering it to purchasers; (4) inflate the price of aluminum by manipulating the supply of aluminum to increase the Midwest Premium; and (5) manipulate the supply of aluminum to benefit their aluminum-based derivative trading. Through this conduct, the defendants unlawfully monopolized, restrained trade in, and manipulated prices of aluminum, causing antitrust injury to plaintiffs and other similarly situated aluminum purchasers in the United States.

88.    The defendants' restraint of trade and anticompetitive conduct have had severe adverse consequences on competition, prices and the availability of aluminum. Plaintiff and class members were deprived of normal, competitive aluminum prices. Instead, they were subjected to artificially determined prices and price trends as a direct, foreseeable and intended result of the defendants' unlawful and manipulative conduct. Plaintiff and class members suffered antitrust injury in the form of higher aluminum prices and were injured in their business or

property.

## VI.   Effects on Interstate and Intrastate Commerce

89.     At all relevant times, the defendants transmitted funds, contracts, and other forms

of business communications and transactions in a continuous and uninterrupted flow of commerce

across state and national lines in connection with the storage and delivery of aluminum.

90.     In furtherance of their efforts to monopolize and restrain competition in the

aluminum market, the defendants used the United States mails and interstate and international

telephone lines, as well as means of interstate and international travel.  The defendants' activities

were within the flow of and have substantially affected interstate commerce.

91.     The defendants' anticompetitive conduct has substantial intrastate effects in that,

among other things, consumers in each state have had to pay inflated prices for aluminum, which

directly impacts and disrupts commerce in each state.

## VII.   Class Action Allegations

92.     Plaintiff brings this action as a class action under Federal Rules of Civil Procedure

23(b)(3) on behalf of itself and others similarly situated.  The class is defined as:

> All persons and entities who, from February 1, 2010 to the present, purchased
> aluminum indirectly from aluminum manufacturers and integrated producers
> in the United States who charged a price based on or incorporating the
> Midwest Premium.

93.     The defendants and their employees, affiliates, parents, subsidiaries and co-

conspirators are excluded from the class.

94.     The proposed class is so numerous that joinder of all members is impracticable.

The class members are geographically dispersed throughout the United States.  The number and

identity of class members is unknown to plaintiff at this time, although plaintiff believes that at

least thousands of geographically-dispersed class members purchased aluminum during the class

period.

95.     Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual members of the class.  Among the questions of law and fact common to the class are:

a.     Whether the defendants monopolized, attempted to monopolize, or conspired to monopolize the market for LME-certified aluminum warehousing;

b.     Whether the defendants combined, conspired and agreed to restrain supplies of aluminum or inflate the Midwest Premium;

c.     Whether the defendants manipulated the price of aluminum in violation of the Sherman Act and the Cartwright Act;

d.     Whether the defendants' conduct was unlawful or unfair in violation of California Business & Professions Code § 17200;

e.     Whether the price inflation caused antitrust injury to the property of plaintiff and class members; and

f.     Whether damages, injunctive, equitable or other relief is warranted.

96.     Plaintiff's claims are typical of the claims of the other class members in that they all sustained damages arising out of the defendants' course of unlawful conduct.

97.     Plaintiff will fully and adequately protect the interests of all class members, and has no interests adverse to other class members.  Plaintiff has retained counsel experienced in the prosecution of antitrust class actions.

98.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly situated

persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

   99.  Plaintiff knows of no difficulty in the management of this action as a class action.

   100. In the alternative, the class may be certified under Rule 23(b)(1), 23(b)(2) or 23(c)(4) because:

     a.  The prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for the defendants;

     b.  The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

     c.  The defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the members of the class as a whole; and

     d.  The claims of class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

VIII.    **Causes of Action**

**First Cause of Action**
**Monopolization, Attempted Monopolization, and Conspiracy to Monopolize**
**in Violation of Cal. Bus. & Prof. Code § 16700 et seq.**
**(against all defendants)**

101.    Plaintiff incorporates the preceding paragraphs by reference.

102.    At all relevant times, the defendants possessed substantial monopoly power in the United States market for LME-certified warehousing of aluminum.

103.    Alternatively, the defendants possessed a dangerous probability of achieving monopoly power in the United States market for LME-certified warehousing of aluminum.

104.    The defendants knowingly and willfully combined to engage in an anticompetitive scheme designed to unlawfully or unfairly extend and maintain their monopoly power or, in the alternative, to obtain monopoly power.  The defendants' scheme included their agreement to: (1) acquire companies that own a majority of the LME-certified warehouses; (2) induce aluminum producers to store their aluminum in the defendants' LME-certified warehouses by, among other things, paying incentives; (3) stockpile aluminum by treating the LME load-out rules as maximums rather than minimums and by shuffling aluminum among warehouses; (4) inflate the price of aluminum by manipulating the supply of aluminum to increase the Midwest Premium; and (5) manipulate the supply of aluminum to benefit their aluminum-based derivative trading.

105.    Through their anticompetitive scheme, the defendants willfully maintained their monopoly power in the relevant market by means of restrictive or exclusionary conduct, rather than by means of greater business acumen.

106.    The defendants' conduct violated the California Cartwright Act, California Business and Professions Code section 16700 et seq., and California common law.

107.    Through their anticompetitive scheme, the defendants also knowingly and

intentionally conspired to maintain and enhance their monopoly power, and to restrict trade and commerce to boost their profits. Each defendant committed at least one overt act in furtherance of the conspiracy.

108.    Plaintiff and class members have been injured in their business or property by the defendants' antitrust violations. Plaintiff and class members were forced to pay inflated prices for aluminum despite market conditions that would have caused prices to decrease but for the defendants' monopolistic and anticompetitive conduct.

**Second Cause of Action**
**Conspiracy and Combination in Restraint of Trade**
**in Violation of Cal. Bus. & Prof. Code §16700 et seq.**
**(against all defendants)**

109.    Plaintiff incorporates the preceding paragraphs by reference.

110.    The defendants combined, conspired or formed a trust with each other to unreasonably restrain trade and commerce by raising, fixing, maintaining or stabilizing the price of aluminum in the United States.

111.    The defendants' conduct, including their agreement to use their control of a majority of LME-certified aluminum warehouses to manipulate the supply of aluminum and artificially inflate aluminum prices constitutes a per se violation of the California Cartwright Act, California Business & Professions Code section 16700 et seq.

112.    Plaintiff and class members have suffered substantial injury in fact and have lost money or property as a result of the defendants' unlawful acts and practices, in that plaintiff and class members have paid inflated prices for aluminum because of the defendants' unlawful agreement, combination or conspiracy and their unlawful, anticompetitive practices.

### Third Cause of Action
### Unfair Competition in Violation of
### Cal. Bus. & Prof. Code §17200 et seq.
### (against all defendants)

113.    Plaintiff incorporates the preceding paragraphs by reference.

114.    The defendants have violated and continue to violate California's Unfair

Competition Law by engaged in unlawful, unfair and fraudulent business acts and practices.

115.    The defendants' acts and practices constitute unlawful practices because they

violated section 1 of the Sherman Act, 15 U.S.C. §§ 1, and the California Cartwright Act,

California Business & Professions Code section 16700 et seq.

116.    The defendants' acts and practices constitute unfair business practices in that

(i) they are unethical, unscrupulous, and substantially injurious to consumers; (ii) any legitimate

utility of the defendants' conduct is outweighed by the harm to consumers; (iii) the injury is not

one that consumers could have reasonably avoided; and/or (iv) the defendants' conduct is contrary

to public policy, including the policies embodied in the Cartwright Act.

117.    As a result of the defendants' unlawful and unfair business acts and practices,

plaintiff and class members have suffered injury in fact and lost money or property.  Plaintiff and

class members have paid inflated prices for aluminum.

### Fourth Cause of Action
### Declaratory and Injunctive Relief Under Section 16 of the Clayton Act
### for Violations of Section 1 of the Sherman Act
### (against all defendants)

118.    Plaintiff incorporates the preceding paragraphs by reference.

119.    Beginning on or about February 1, 2010 and continuing through the present, the

defendants entered into a continuing agreement, contract, combination or conspiracy to

28

unreasonably restrain trade and commerce in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

120.    The defendants agreed, combined or conspired to raise, fix, maintain or stabilize the price of aluminum sold in the United States.

121.    The agreement, contract, combination or conspiracy among the defendants consisted of a continuing agreement, understanding or concerted action among the defendants.

122.    The defendants' conduct constitutes a per se violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade. There was no legitimate, pro-competitive business justification for the defendants' combination or conspiracy, or their agreements to restrain competition and artificially inflate the price of aluminum. Even if there were some conceivable justification, their agreements were broader than necessary to achieve any legitimate purpose.

123.    As a direct and proximate result of the defendants' unlawful conduct, plaintiff and class members were injured in their property or business. Plaintiff and class members have been forced to pay higher prices for aluminum than they would have paid in the absence of the defendants' unlawful conduct. Plaintiff and class members continue to suffer harm, and will continue to suffer harm in the future as a result of paying higher prices for aluminum than they would have paid absent the defendants' unlawful conduct.

124.    Plaintiff and the class seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that the defendants' conduct violates Section 1 of the Sherman Act.

125.    Plaintiff and the class also seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive

market effects caused by defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not reoccur in the future.

## IX.    Demand for Judgment

Plaintiff, on its own behalf and on behalf of the proposed class, demands a judgment that:

a)    Determines that plaintiff's claim may be litigated on a class wide basis under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice be given to the class as outlined by Rule 23(c)(2), and appoints plaintiff to represent the class;

b)    Declares that the defendants' conduct violates the Sherman Act and the state statutes identified above;

c)    Enjoins the defendants from continuing their illegal activities and grants other equitable and injunctive relief as necessary to mitigate or prevent future anticompetitive effects of the defendants' conduct;

d)    Enters joint and several judgments against the defendants in favor of plaintiff and the class;

e)    Awards plaintiff and class members damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

f)    Grants plaintiff and the class equitable relief in the nature of disgorgement, restitution, or other relief;

g)    Awards plaintiff and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

h)    Grants any other relief necessary to correct for the anticompetitive market effects

caused by the defendants' unlawful conduct, and as the Court deems just.

## X.   Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, plaintiff demands a trial by jury on all

issues so triable.

Dated: September 13, 2013

Jonathan K. Levine
**GIRARD GIBBS LLP**
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone:  (212) 867-1721
Facsimile:  (212) 867-1767
jkl@girardgibbs.com

Daniel C. Girard
Amanda M. Steiner
Dena C. Sharp
Adam E. Polk
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846
dcg@girardgibbs.com
as@girardgibbs.com
chc@girardgibbs.com
aep@girardgibbs.com

Chinh T. Vo
**LAW OFFICES OF CHINH T. VO**
385 Grand Ave. Suite 300
Oakland, CA 94610
Telephone: (510) 836-2508
chinhtvo@me.com

Kenneth A. Wexler
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 589-6270
kaw@wexlerwallace.com

Frederic S. Fox
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
ffox@kaplanfox.com

*Counsel for Plaintiff D-Tek Manufacturing*